470 So.2d 262 (1985)
Patricia PHILLIPS, Wife of Reginald C. Wagner, Jr.
v.
Reginald C. WAGNER, Jr.
No. 84-CA-664.
Court of Appeal of Louisiana, Fifth Circuit.
May 13, 1985.
*265 Baldwin & Haspel, William E. Wright, Jr., David P. Banowetz, Jr., New Orleans, for defendant-appellant.
Cabral & Cabral, Harry R. Cabral, Jr., H. Craig Cabral, Metairie, for plaintiff-appellee, cross-appellant.
Before BOUTALL, CHEHARDY and GRISBAUM, JJ.
CHEHARDY, Judge.
We are concerned here with a partition of community property of Reginald C. Wagner, Jr., and his former wife, Patricia Phillips.
Mr. and Mrs. Wagner were married on November 23, 1962. Three children were born of the marriage, Michelle, Greer, and Cadence. Only one child is still a minor. On November 9, 1982 Mrs. Wagner filed a petition for separation from bed and board. Judgment was rendered in her favor on February 23, 1983 and on February 24, 1984 the parties were divorced.
In connection with the separation proceeding Mr. Wagner filed a petition for partition of the community property and a sworn descriptive list of assets and liabilities as of June 14, 1983. The list included stocks, securities, business interests and immovable property. Most of the assets were liquidated thereafter, and the proceeds were deposited in a joint bank account in the names of both parties. These actions were reflected in an amended list submitted on February 23, 1984 and the parties were divorced the following day.
At the trial of the partition the couple agreed that the court would decide the legal and factual issues (i.e., to classify certain property and obligations as chargeable to the community or separate estates), and the accounting aspects would be resolved by the parties.
On April 24, 1984, the trial court issued two judgments which form the basis for this appeal. The first judgment provides that the enhanced value of 52 shares of stock of Wagner & Truax (Realty) Company, Inc., which was owned by Mr. Wagner prior to his marriage, enured to the benefit of the community. The court placed a value of $15,000 on the stock at the inception of the community (1962), and this sum was subtracted from the sale price. Wagner was ordered to account to the community for the enhanced value of $355,821, plus interest.
In the same judgment the court held that the enhanced value of 101 shares of Wagner & Truax Insurance Agency, Inc., stock enured to the benefit of the community. A 1962 value of $5,000 was assigned to this stock, and Wagner was ordered to account to the community for the enhanced value of $57,500, with interest.
We shall discuss the other judgment later in this opinion. Mr. and Mrs. Wagner have appealed from both judgments.
The first question for our determination is whether or not the trial court correctly apportioned the proceeds of the original 52 shares of stock of Wagner & Truax, Company, Inc., to the community.
It is Mr. Wagner's position that this stock at its inception, and at all times thereafter, was his separate property and always remained under his administration and control.
It is Mrs. Wagner's position that although the trial court was correct in recognizing the enhancement in value as a community asset, nevertheless the court erred in allowing Mr. Wagner a $15,000 credit against the enhanced value.
In addressing these issues we examine the transactions of the realty corporation in chronological order from its inception until the sale:
On or about November 21, 1960, two years prior to his marriage, Mr. Wagner formed a corporation known as Wagner Company, Inc., to engage in the business of selling real estate. As principal owner he held 100 shares of the 104 shares issued. The work force consisted of Mr. Wagner and five or six sales people.
On January 5, 1961, Dalton Truax became a 50% owner, and the name of the *266 corporation was changed to Wagner & Truax Company, Inc. The stock ownership was realigned and Mr. Wagner and Mr. Truax each became owners of 52 shares. These are the shares which are in question here. The company prospered.
On November 23, 1962 the Wagners were married, and the community came into existence. At that time the company had about 30 sales people and was generating $700,000 to $1,200,000 in sales per month and grossed $250,000 to $300,000 that year.
Wagner and his partner Truax had other investments and enterprises. One of these joint projects was Causeway Enterprises, Inc., which was founded on December 31, 1964. The principal purpose of this corporation was to construct, own, lease and operate an office building on Causeway Boulevard in Metairie, Louisiana, to be occupied principally by the realty company. When Causeway Enterprises was formed, Mr. Wagner and Mr. Truax each received 50 shares of stock in that corporation.
On December 30, 1971, seven years after its inception, Causeway Enterprises merged with Wagner & Truax Company. In connection with the merger Wagner and Truax each surrendered their 50 shares of Causeway Enterprises stock and received in return an additional 50 shares of stock in Wagner & Truax Company, Inc., and Causeway Enterprises went out of existence.
Thus Mr. Wagner now had 102 shares of the realty company stockthe 52 shares he held prior to the marriage, plus the 50 shares acquired following the merger. These 50 shares are admittedly community property and when they were sold the community received full payment. They are not an issue here.
Wagner contends the community was fully compensated for its interest in Causeway Enterprises by the issuance of the additional 50 shares of Wagner & Truax Company stock, and the community received substantial tax benefits from the merger.
In connection with the circumstances which give rise to the merger, Mr. Wagner testified:
"* * * Causeway Enterprises, Inc. was an ordinary corporation. It could not elect Subchapter S, because basically all its income was passive income.
"We were creating a loss in that corporation that was just staying in the corporation and wasn't helping myself or my partner at all.
"We consulted Arthur Andersen & Co. and there were several alternatives, one we could liquidate that corporation then put the property in our own names, but if we would have done that, we would have had a big capital gain.
"The more preferred method was to merge that corporation into Wagner-Truax Company, Inc. which in fact was a Subchapter S corporation. Then the losses generated by that real estate would be a very distinct advantage to offset the income that my partner and I received from Wagner-Truax Company, Inc." (Tr. Vol. 2, pp. 106-107.)
On or about May 11, 1983 Mr. Wagner sold the 52 shares of Wagner & Truax Company stock to Dalton Truax for $370,821. Mrs. Wagner was unaware of this transaction.
Shortly thereafter Mr. and Mrs. Wagner sold the 50 community shares of Wagner & Truax Company to Mr. Truax for $357,564. These were the shares received from the merger of Causeway Enterprises in 1971.
The 52 shares of stock in Wagner & Truax Company which were Wagner's prior to his marriage are clearly his separate property under LSA-C.C. art. 2341, which provides in pertinent part:
"The separate property of a spouse is his exclusively. It comprises: property acquired by a spouse prior to the establishment of a community property regime; property acquired by a spouse with separate things or with separate and community things when the value of the community things is inconsequential *267 in comparison with the value of the separate things used * * *."
Mrs. Wagner concedes the 52 shares he owned prior to the inception of the community were his separate property, but she contends that the value of those shares at that time did not exceed $1,500 and that the value of the shares appreciated considerably only after the acquisition of community property, namely the Causeway office building built by Causeway Enterprises prior to its merger with Wagner & Truax Company. She claims this is so because the price of the realty shares sold in 1983 was entirely related to the physical assets of the companythe Causeway building and an office building located on General De Gaulle Boulevard in Algiers. She contends the Causeway building, which was community property, was commingled with the realty company in the form of stock, and thus the enhancement in value of the stock was properly awarded to the community.
We do not agree that the value of the 52 shares of Wagner & Truax Company stock was inconsequential at the inception of the community. The company was successful from the very beginning and the community received substantial income from the funds withdrawn as salary by Mr. Wagner almost immediately.
Mrs. Wagner's position disregards basic principles of corporate law. The Causeway office building was built by Causeway Enterprises, Inc. The Wagner community owned 50 shares of stock in that corporation, but the corporation and not the community owned the building.
This position is amply supported by the jurisprudence. As stated by our Supreme Court in Screwmen's Benev. Ass'n v. Monteleone, 168 La. 664, 123 So. 116, 117 (La. 1929):
"When once a legal and valid existent corporation becomes the owner of property, such property remains the property of the corporation until disposed of in the manner provided by the charter or by the law.
"Neither the stockholders of a stock corporation nor the members of a non-stock corporation ever become the owners in common of the property of such corporations."
A corporation is a distinct entity from all of the members who compose it. LSA-C.C. art. 435. The estates and rights of a corporate being belong exclusively to the corporation and not to its members. LSA-C.C. art. 436. This basic principle has been consistently followed by the Louisiana courts. See Union Local P-1476, etc. v. Union, etc., 408 So.2d 371 (La.App. 1st Cir.1981).
The merger of the two corporations was not a sale of assets whereby the Wagner community exchanged one community asset for another community asset. The 52 shares of Wagner & Truax Company stock which Mr. Wagner owned prior to his marriage were never commingled with any community assets. There is no factual basis to indicate that separate property was improved with community property.
On the contrary, the community began to receive benefits in the form of the substantial salary Mr. Wagner received immediately. This is established by the testimony of Mr. Wagner, Mr. Truax, and James W. Miley, a partner in the accounting firm of Arthur Anderson, Inc.
As sole shareholders, Mr. Wagner and Mr. Truax took out all of the cash flow of the realty corporation. No money earned by the company was reinvested in it. In fact the partners were taking out so much money they became concerned they might not be able to justify as salary the income they were withdrawing for their duties to the corporation and that the money might be considered as dividends, which would mean double taxation. Therefore on the advice of their accountants, Wagner & Truax Company became a Subchapter S corporation.
Testimony of Mr. Truax and Mr. Miley confirms Mr. Wagner's contention that the Wagner community received the greatest possible compensation from his common labor. *268 Miley reviewed all of the relevant tax returns, which are in evidence, and stated that Mr. Wagner and Mr. Truax withdrew over $2,250,000 from the realty company between 1971 and 1982, and the personal returns of the Wagners indicate that one-half of the income generated by the corporation flowed through their community.
In addition, the community received substantial income from Wagner & Truax Insurance Agency, Inc.
This corporation was formed in 1961, also before the marriage. Originally, Mr. Wagner and Mr. Truax each owned 99 shares. Two shares were owned by Mr. Wagner's father. Upon the death of the father, Mr. Wagner inherited his two shares. Wagner's ownership of 101 shares of this corporation continued until he sold his shares to Mr. Truax in 1983 for $62,500.
The court ordered Wagner to account to the community for the enhanced value of $57,500, assigning the value of the stock in 1962 at $5,000.
Wagner claims the enhancement is his separate property. Mrs. Wagner disputes the credit of $5,000.
At the same time that Wagner & Truax Company was prospering, the insurance company was also a successful firm. Wagner and the one and only employee were both registered insurance agents. The day-to-day business of the corporation was run by the employee, who received a salary and one-third of the profits. Mr. Wagner and Mr. Truax shared the balance of any profits 50-50. The Wagner income fell into the community.
The substantial income generated from both corporations was more than sufficient for the needs of the community, and Mr. Wagner engaged in numerous enterprises with Mr. Truax and also with other people. He was involved in apartment building ventures, subdivision developments, unimproved land, and other projects, bringing further income into the community. When these investment projects were liquidated Mrs. Wagner received her share of the community property profits.
Mrs. Wagner relies on LSA-C.C. art. 2368 to support the award she was granted by the trial court for the increase in value of this corporation at the time of its sale.
LSA-C.C. art. 2368 provides:
"If the separate property of a spouse has increased in value as a result of the uncompensated common labor or industry of the spouses, the other spouse is entitled to be reimbursed from the spouse whose property has increased in value one-half of the increase attributed to the common labor."
Mr. Wagner answers this contention by pointing to the fact that the profits from the insurance company were the result of the common labor of the employee, and that Wagner's income from that company was merely a distribution of two-thirds of the profit which he shared with Mr. Truax without any common labor rendered by either of them. This means, he contends, that the entire increase in the value of the insurance company was due to natural causes unrelated to his common labor, and is properly classified as his separate property.
We agree that the 101 shares of the insurance agency stock and its enhanced value are Mr. Wagner's separate property, and we will recast the judgment accordingly.
Because we have concluded that the proceeds from the 52 shares of Wagner & Truax Company, Inc., and the proceeds from the sale of the 101 shares of Wagner & Truax Insurance Agency stock are the separate property of Mr. Wagner, including the enhancement in value of each corporation, we find it unnecessary to discuss Mrs. Wagner's claims of set-offs. Mr. Wagner is not required to account to the community for the enhanced value of his separate property in regard to these two stocks.
The second judgment charged Mr. Wagner's separate estate with the following expenses: (1) $48,000 paid to Mrs. Wagner in monthly installments of $8,000 from December 1982 through May 1983; (2) high school and college tuition for the Wagner *269 children in the sum of $5,953; and (3) children's allowances of $1,216.62.
The following expenses were charged "to the separate estate of each of the parties on an equal basis": (1) business and administrative expenses incurred by Mr. Wagner in the sale of community assets ($6,434.90); (2) family health insurance premiums ($874.72); (3) the sum of $13,498.22 paid on the charge accounts in the name of Mr. and/or Mrs. Wagner for sums which were due as of the effective date of the separation; and (4) moving and storage expenses for Mrs. Wagner ($2,644.50).
These expenses were charged to the separate estate of Mrs. Wagner: (1) purchases charged by her to Mr. Wagner's American Express card after the separation ($7,443.03); (2) purchases charged to various credit cards of Mr. Wagner after the separation ($554.65); (3) rent for the family home occupied by Mrs. Wagner after the act of sale ($6,597.34); (4) rental up to $8,000 subsequent to June 1983; (5) $2,100 anticipated orthodontist bill for one of the children; (6) mortgage payments paid on the family home from November 1982 through May 1983 ($14,365.09); (7) payments made on auto loans for cars driven by the children from November 1982 through May 1983 ($2,444.93); and (8) maintenance charges of $827.33 for the Jaguar driven by Mrs. Wagner.
The judgment also ordered Mr. Wagner to pay $5,584.66 plus interest to Mrs. Wagner for her share of community funds which remained in his possession which was not used to pay community debts, and bore no interest.
Mr. Wagner contends the trial court erred in this judgment in the following respects:
1. Charging his separate estate for the $8,000 monthly payments made to Mrs. Wagner from December 1982 through May 1983;
2. Charging his separate estate for the school tuitions of the children; and
3. Charging Mrs. Wagner's moving and storage expenses to the community.
Relative to the first contention, it is Wagner's position that the payments of $8,000 per month were intended to be advances on Mrs. Wagner's share of the community, and therefore should have been charged to her separate estate.
The trial judge did not agree with this conclusion, nor do we. After the couple separated, Mr. Wagner retained control of the community funds and agreed to deposit to Mrs. Wagner's bank account $8,000 per month for household expenses, as he had done at all times during the marriage. This agreement was confirmed in writing in correspondence between the two attorneys representing the parties. The litigants do not dispute this agreement of December 17, 1982.
The letter reads as follows:
"This is to confirm our telephone conversation wherein I advised that our client, Reginald C. Wagner, has agreed to continue to support Mrs. Wagner in the same manner he has for some time. I understand that Mr. Wagner has been depositing $8,000.00 per month in a joint checking account which is utilized by Mrs. Wagner and this amount is supplemented to the extent that there are extraordinary expenses incurred by Mrs. Wagner during the month.
"As we discussed, this agreement by Mr. Wagner is in lieu of establishing a formal alimony payment by way of judgment of the court. In the event that Mr. Wagner is unable or unwilling to proceed with this practice in the future, Mrs. Wagner will naturally have a right to seek alimony through the judicial process."
In the trial court Mrs. Wagner contended these payments were voluntary payments intended by the parties to constitute alimony pendente lite.
In this court Mr. Wagner relies on the case of Perez v. Perez, 334 So.2d 719 (La. App. 4th Cir.1976), to support his position that they were advances against the community. In Perez the parties agreed that Mr. Perez would pay his wife $3,000 per *270 month for her support. The court determined these payments were advances on the community. A careful reading of the Perez case indicates clearly that the parties had agreed that the payments were to be an advance of Mrs. Perez's community share.
That is not the case here. The agreement clearly reflects the $8,000 payments for household expenses were in lieu of alimony pendente lite by a formal court judgment.
Alternatively Mr. Wagner contends if the payments are to be regarded as alimony pendente lite they are still chargeable to Mrs. Wagner's separate estate. He relies on the case of Messersmith v. Messersmith, 229 La. 495, 86 So.2d 169 (1956). He recognizes that the Messersmith case was decided under the prior rule that the community terminated on the date the judgment of separation was rendered, rather than the current law which provides that the community termination is retroactive to the date on which the petition was filed. LSA-C.C. art. 155. He concluded Messersmith has been misinterpreted, and that alimony payments should be considered as advances from her undivided one-half share, even under the current law.
The jurisprudence does not support his position. In the case of Patterson v. Patterson, 417 So.2d 419, 422 (La.App. 1st Cir.1982), (writ denied), the court said:
"Messersmith's holding that alimony pendente lite should be paid from the community was based on the fact that the community still existed. However, under the present C.C. art. 155, that is no longer the case. The community ceases to exist retroactively as of the date of filing suit for separation or divorce. Thus, the reasoning in Messersmith, if anything, now supports the proposition that the party from whom alimony is due cannot obtain reimbursement from the community."
The case of Gondrella v. Gondrella, 347 So.2d 938 (La.App. 4th Cir.1977), also held that with respect to alimony payments, the husband was not entitled to reimbursement out of the community for that amount. And in Palama v. Palama, 323 So.2d 823 (La.App. 4th Cir.1975) (writs denied, 326 So.2d 381), the court also held that previous payments of alimony pendente lite do not form the basis for a credit to the husband from community funds.
LSA-C.C. art. 148 provides for alimony pendente lite in favor of the wife where she has not sufficient income for her maintenance as "a sum for her support, proportioned to her needs and the means of her husband." The article relates to the amount and to the circumstances of the parties. It does not suggest some debt is created against the community in favor of the husband if and when the community is dissolved by a subsequent judgment of separation or divorce. This is consistent with the jurisprudence which has considered the relationship among LSA-C.C. arts. 148, 119 and 120.
While the Wagner community was indeed substantial there was no showing Mrs. Wagner had sufficient income without the continuation of the $8,000 monthly he had always made available to her for household expenses, as Mr. Wagner was maintaining control of the community funds. The personal agreement of the parties indicates they both regarded it as alimony pendente lite.
Wagner claims that during this period Wagner & Truax Company was experiencing a negative cash flow and all of these payments were with community assets, certificates of deposit, savings accounts, etc., and that he was receiving no income from Wagner & Truax Company. Therefore he claims it would be unfair to award Mrs. Wagner $8,000 per month and also her entire share of the community income generated between December 1982 and May 1983. He relies on the concurring opinion of now Justice Lemmon in Gondrella v. Gondrella, supra.
Other than Mr. Wagner's self-serving testimony as to the source of such payments there is no evidence of this. The trial court apparently concluded Mr. Wagner *271 had not borne his burden of proof on that issue. This is particularly true where the assets of Mr. Wagner both in his separate estate and the community are so substantial and documented to such an extent that proof, other than his own testimony, should have been readily available.
We agree with the trial court that the $48,000 paid to Mrs. Wagner for her support during the period in question was not an advance on her share of the community.
Wagner next contends the school tuitions are community expense. He paid high school and college tuition for the children which he claims he was not required to do under the agreement. Mrs. Wagner claims this is an "extraordinary expense" contemplated by the agreement. The trial judge agreed.
It is Wagner's position that under LSA-C.C. art. 227 parents have a joint obligation to support and educate their children, and this obligation is not terminated simply because the parents became separated. Lewis v. Lewis, 404 So.2d 1230 (La.1981); Petrich v. Petrich, 430 So.2d 829 (La.App. 5th Cir.1983); Castille v. Buck, 411 So.2d 1156 (La.App. 1st Cir.1982).
Mrs. Wagner's position is that at the time payments were made she had no funds and that she did contribute to the support of her children by performing other duties such as preparing meals, washing, buying clothing, providing transportation, etc.
While Mrs. Wagner was receiving substantial sums for household expenses she did not have available to her at that time the funds to pay over $5,000 in December for the children's tuition. We agree with the trial court that the tuition constituted extraordinary expenses contemplated by the agreement.
Mr. Wagner's final contention is that the moving and storage expenses of Mrs. Wagner should be charged to her separate estate. In connection with these expenses the parties had entered into a written agreement on December 18, 1983 whereby Mr. Wagner had agreed to advance from the Wagner escrow account moving expenses upon submission of a bill to his attorneys from Mrs. Wagner.
Wagner avers that the agreement only specifies that he will make these funds available to Mrs. Wagner, and not that they should be charged to the community. Mrs. Wagner, on the other hand, contends that the moving expenses are extraordinary expenses contemplated under the original agreement, and spelled out with particularity in the later agreement.
Mr. Wagner states that if the court finds the moving expenses are properly a community expense then only that portion of the charges referrable to moving should be included. A review of the invoices show expenses of $450.50 for preliminary packing, and the balance of the charges refer to storage, insurance, handling fees, etc.
Mrs. Wagner claims the storage costs were a necessary expense for the preservation of community assets. LSA-C.C. art. 2360. See also Jackson v. Jackson, 425 So.2d 379 (La.App. 3d Cir.1982). After the family home was sold Mrs. Wagner stored the furniture while she was selecting another apartment. She later purchased the furniture as part of the division of the community property. The trial court apparently concluded the agreement between the parties obligated Mr. Wagner to pay the moving expenses and that the storage expenses were valid as preservation of community property. We find no error here.
We now turn our attention to Mrs. Wagner's cross appeal.
Mrs. Wagner contends the trial court incorrectly charged the community with $6,434.90 business and administrative expenses incurred by Mr. Wagner in administering and selling community assets. She claims her former husband has not borne his burden of proof showing the expenditure was for the common interest of the spouses.
We disagree with this contention. When Mr. Wagner was informed by his doctors that he had terminal cancer he set *272 about trying to get his estate in order. This involved liquidating numerous corporations and administering millions of dollars worth of assets. He worked for eight or nine months to dispose of all of the properties and to run five or six companies in which he had an interest. He was involved with numerous partners, and negotiations were necessarily complex. There is no evidence, nor any suggestion, that he carried on these duties in any way other than an exemplary manner.
We conclude that Mr. Wagner was able to resolve the business negotiations in far less time than it could have been done by anyone unfamiliar with the businesses in which he was involved. It appears to have been done in a minimum amount of time and was of great benefit to the community. We also believe the charges are substantially less than they would have been if outside business experts would have had to be engaged to handle this complex community. The trial court correctly charged these expenses to the community, and we conclude such services have been of great benefit to Mrs. Wagner.
Mrs. Wagner also objects to the trial court determination that $874.72 paid by Mr. Wagner for medical insurance for the entire family should be charged to the community. She claims that under the December 1982 agreement these premiums constitute extraordinary expenses. The trial court indicated it considered extraordinary expenses to mean expenses for medical emergencies, deductible amounts of medical insurance policies if disaster strikes, and things of that nature.
Since the premium payment covered the entire family, both parties benefited from coverage, and it also helped to provide for the health and welfare of their children. The premiums do not constitute extraordinary expenses and were properly charged to the community.
Mrs. Wagner's third contention is that the court incorrectly charged her separate estate for rent incurred when she continued to live in the family home after it was sold. The sale took place in June 1983. The purchaser agreed that Mrs. Wagner could remain if she wished, provided he received in rent an amount equal to his mortgage payments.
Therefore at the conclusion of the sale the purchaser was given a check by Mr. Wagner to cover Mrs. Wagner's rent. She claims it was her husband's obligation to maintain his family in the family residence as long as they wished to stay there, that it was his idea to sell the house, and that she was unprepared to move when the house was sold.
Due to the sale she no longer needed money from her husband to meet the mortgage, but she needed the money to pay rent. She claims the rent should have been part of her husband's alimony obligation and therefore charged to his separate estate.
Mr. Wagner cites a new agreement reached between the parties in July 1983 whereby Mrs. Wagner was to receive one-half of the monthly interest accruing on a Flex Fund bank account. This interest exceeded $5,000 per month. In addition, Mr. Wagner agreed to pay her $1,000 per month alimony and $2,000 per month child support. This agreement thus obligated Mr. Wagner to supplement Mrs. Wagner's one-half of the monthly interest generated by the Flex Fund account with $3,000 per month. This agreement did not provide for any payment other than the $3,000 per month by Mr. Wagner. Therefore the trial court held that the sum incurred for rent for the family home was properly charged to Mrs. Wagner's separate estate. We agree with that conclusion.
Mrs. Wagner further objects to her separate estate being charged with rent up to $8,000 incurred for 60 days after she moved out of the family home. Our attention is called to a supplemental agreement between the parties which provided for rent for an appropriate apartment for up to 50 days, with a monthly rental not to exceed $2,000. Alternatively she asserts that $4,000 of the $8,000 should be charged to Mr. Wagner's separate estate as this was *273 specifically part of the supplemental agreement.
It is Mr. Wagner's position that after June 11, 1983 his obligations were controlled by the July agreement which encompassed the Flex Fund interest and the $3,000 support payments for his former wife and children. The trial court agreed with Mr. Wagner's position and correctly charged the post-separation rent to Mrs. Wagner's separate estate.
Mrs. Wagner also cites as error that her separate estate was charged with $14,365 incurred by mortgage payments she made on the family home prior to its sale. She relies on the case of Lentz v. Lentz, 411 So.2d 59 (La.App. 4th Cir.1982). Under Lentz after the parties separated they became co-owners in indivision in the family home and were entitled to reimbursement of one-half of all amounts paid with separate funds on the mortgage notes.
Mr. Wagner claims Lentz is distinguishable from the instant case because here the parties clearly agreed that the mortgage payments were to be paid out of the $8,000 monthly allowance for household expenses under the original agreement. When the couple were married Mrs. Wagner made mortgage payments out of her $8,000 monthly household allowance, and she continued to do so after the separation.
Since the obvious intent of the parties here is that the mortgage payments were to be paid out of the $8,000 Mr. Wagner paid his wife after the separation, the mortgage payments were properly charged to her separate estate.
The Lentz case is not apropos here because in Lentz the parties had not reached any agreement concerning the mortgage payments. Therefore the Lentz court applied the general principles of ownership and charged each party with one-half of the mortgage payments.
Finally Mrs. Wagner contends her separate estate was improperly charged with car payments for automobiles driven by the children, and for repairs to her own Jaguar. She alleges the parties are co-owners in indivision of various property constituting the community estate and that each are equally responsible for their upkeep and maintenance.
Mr. Wagner points out that these payments and repairs were simply household expenses contemplated by the $8,000 per month Mrs. Wagner was receiving and that the children drove the cars infrequently. The trial court agreed with Mr. Wagner, and the record supports that finding. We agree with the trial court that these expenses were intended to be covered by the original agreement and do not qualify as extraordinary expenses.
For the reasons assigned we annul, avoid and set aside the judgment decreeing the sale of 52 shares of stock of Wagner & Truax Company, Inc., was for the benefit of the community estate and recast that portion of the judgment as follows:
IT IS ORDERED, ADJUDGED AND DECREED that the 52 shares of stock of Wagner & Truax Company, Inc., acquired by Reginald C. Wagner, Jr., prior to his marriage is hereby declared to be his separate property, and he is not required to account to the community estate for any of the proceeds of the sale.
We further annul, avoid and set aside that portion of the judgment wherein it was decreed that the sale of stock of Wagner & Truax Insurance Agency, Inc., was for the benefit of the community, and IT IS NOW ORDERED that the sale of 101 shares of stock of Wagner & Truax Insurance Agency, Inc., acquired by Reginald C. Wagner, Jr., prior to his marriage was for the benefit of his separate estate, and he is not required to account to the community for any of the proceeds of the sale.
In all other respects the judgments appealed from are affirmed.
AFFIRMED IN PART; ANNULLED, AVOIDED, SET ASIDE AND RECAST IN PART.